# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| BAE Systems Land & Armaments, L.P.,<br><br>       Plaintiff,<br><br>v.<br><br>Ibis Tek, LLC,<br><br>       Defendant. | Case No. 14-cv-3111 (SRN/TNL)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Jeff H. Eckland and Mark J. Blando, Eckland & Blando LLP, 800 Lumber Exchange, 10 South Fifth St., Minneapolis, MN 55402; Barbara A. Duncombe and Suzanne Sumner, Taft Stettinius & Hollister LLP, 40 North Main St., Ste. 1700, Dayton, OH 45423; William Charles Wagner, Taft Stettinius & Hollister LLP, One Indiana Square, Ste. 3500, Indianapolis, IN 46204, for Plaintiff.

John G. Horan, Dentons US, 1900 K St. NW, Washington, DC 20006; Dara D. Mann, McKenna Long & Aldridge LLP, 303 Peachtree St. NE, Ste. 5300, Atlanta, GA 30308; Sonia L. Miller-Van Oort, Sapientia Law Group, 120 South Sixth St., Ste. 100, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff BAE Systems Land & Armaments, L.P.'s Motion for Summary Judgment for Declaratory Relief ("BAE's Motion") [Doc. No. 69]. A hearing on BAE's Motion was held on March 25, 2016. For the reasons set forth below, BAE's Motion is granted in part and denied in part.

I.     **BACKGROUND**

**A. Facts**

The material facts of this matter are not in dispute.  Plaintiff BAE Systems Land & Armaments, L.P. ("BAE") is a contractor that provides equipment to various branches of the United States military.  (Aff. of Sarah J. Massuch ("Massuch Aff.") at ¶ 3 [Doc. No. 71].)  In 2007, BAE contracted with the United States Department of Army TACOM Life Cycle Management Command ("Army"), as the prime contractor, to provide emergency escape window kits for certain Army vehicles.  (Id. at ¶ 4 and Ex. B ("Prime Contract") [Doc. No. 71-1].)  Days later, BAE entered into a subcontract with Defendant Ibis Tek, LLC ("Ibis") whereby Ibis would manufacture and supply the windows required by the Prime Contract.  (Id. at ¶ 5 and Ex. C ("Subcontract") [Doc. No. 71-2].)

Ibis was contractually obligated to provide BAE with certified (i.e., accurate) cost and pricing data.  (See Subcontract at 2.030-2.031.[1])  As explained below, in addition to this contractual obligation, federal statutes and regulations required that Ibis provide accurate cost and pricing data.  Ibis gave BAE cost and pricing information regarding the windows, which BAE in turn submitted to the Army.  (Massuch Aff. at ¶ 8 and Ex. D ("Cert. of Costs and Pricing Data") [Doc. No. 71-3].)  Ibis' work under the Subcontract was completed a few months later, at which time BAE paid Ibis in full.  (Id. at ¶ 9.)

In 2009, the Defense Contract Audit Agency ("DCAA") began a post-award audit of the Subcontract to determine if Ibis' cost and pricing data was defective.  (Id. at ¶ 10.)

---

[1] The Court cites to the page numbers of the Subcontract as they appear in the lower right hand corner of that document.

After an extensive back-and-forth between DCAA and Ibis, lasting nearly a year, the DCAA concluded that Ibis' pricing and cost data was defective because it was not accurate, complete, and current at the time it was submitted.  (Id. at ¶¶ 12–13; Second Am. Compl. at ¶ 12 [Doc. No. 65]; Ans. to Second Am. Compl. ("Ans.") at ¶ 12 [Doc. No. 66].)   Later, the Army's Contracting Officer (the "Contracting Officer") issued demand letters to BAE stating that BAE was indebted to the Army because of Ibis' failure to provide accurate cost and pricing data.[2]  (Massuch Aff., Ex. E ("Initial Demand Ltr.") [Doc. No. 71-4] and Ex. F ("Revised Demand Ltr.") [Doc. No. 71-5].)

At Ibis' request[3], BAE agreed to sponsor a claim to the Contracting Officer challenging the defective pricing data determination.  (Massuch Aff. at ¶¶ 16–17.)  The parties entered into an agreement regarding this sponsorship.  (See Exhibits and Exhibit List in Supp. of Mem. in Opp. ("Ibis' Ex. List") [Doc. No. 83], Ex. A ("Sponsorship Agreement").)  In relevant part, the Sponsorship Agreement held:

---

[2] In government contracting, only the prime contractor (here, BAE) and the government have privity of contract.  Thus, the government will recoup overpayments related to defective pricing data from the prime contractor, even if that data was supplied by a subcontractor (here, Ibis).  The prime contractor must then attempt to recover from the subcontractor.  See Ralph C. Nash Jr., et al., The Government Contracts Reference Book, 449 (3rd ed. 1998); Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1263 (Fed. Cir. 2005) ("As a general rule, the government consents to be sued only by those with whom it has privity of contract.  As a result, a subcontractor generally cannot bring a direct appeal against the government." (quotations and citations omitted)).

[3] Ibis had to pursue its appeal through BAE because it lacked privity of contract with the government.  See supra n.2.

3

1. "[Ibis] is responsible for investigating and prosecuting any and all of its claims against the Army related to [the Army's defective pricing determination] . . . ." (Id. at 3.003.[4])

2. "Any agreement by [BAE] to allow [Ibis] to proceed [with its challenge] shall not be considered as any agreement on the part of [BAE] to waive its right of repayment from [Ibis] for any amounts that the Army recoups against [BAE] as a result of [Ibis'] alleged defective pricing." (Id. at 3.004.)

3. "[Ibis] agrees to pay [BAE] for any costs or expenses (other than the costs of employee time during ordinary business hours) required to sponsor and support the claim or otherwise respond to [Ibis'] requests." (Id. at 3.008.)

4. Ibis would have sole discretion whether to appeal the Contracting Officer's decision and the terms of the Sponsorship Agreement would apply to that appeal. (Id. at 3.009.)

BAE ultimately sponsored Ibis' claim to the Contracting Officer, challenging the defective pricing determination. (Ibis' Ex. List, Ex. B ("Claim to Contracting Officer").)

On March 14, 2014, the Contracting Officer issued a Final Decision that denied Ibis' claim and upheld the DCAA's determination that Ibis' cost and pricing data was defective. (Massuch Aff., Ex. G ("Final Decision") [Doc. No. 71-6].) The Final Decision stated that the government would recoup from BAE an amount representing the damages from the defective pricing (i.e., the amount the Army overpaid because of the defective pricing), prejudgment interest, a penalty, and an administrative fee. (See Final Decision at 2–3.) Pursuant to the Final Decision and its statutory authority to do so, the government recouped a total of $2,740,910.27 from BAE over the next few months. (Massuch Aff. at ¶ 21.)

---

[4] The Court cites to the page numbers as they appear in the lower right hand corner of this exhibit.

After the Final Decision was issued and throughout the government's recoupment, BAE repeatedly demanded that Ibis indemnify it against this loss pursuant to the terms of the Subcontract.  (See id. at ¶¶ 19–20 and Ex. H ("BAE Indemnity Demand Ltr.") [Doc. No. 71-7].)   The Subcontract contains two indemnity provisions.   The first reads in relevant part:

> [Ibis] agrees to assume entire responsibility and liability for injuries (including death) to any person, whether an employee of [Ibis] or otherwise, for loss of or damage to any property regardless of ownership and for any other loss or legal damages, arising out of, resulting from, or in any manner connected with the . . . goods supplied by [Ibis] . . . in connection with this order.   [Ibis] further agrees to indemnify, defend and hold harmless [BAE] . . . from and against any and all such loss, damages and injuries (including death) and any and all claims related thereto including, without limiting the generality of the foregoing, claims for which [BAE] may or may not be claimed to be liable (including, without limitation, liability based on negligence or other tort), together with all costs, expenses and legal fees and disbursements paid or incurred in connection with such claims and all legal fees and disbursements paid or incurred to enforce the provisions of this paragraph.

(Subcontract at 2.024 (hereinafter, the "Broad Indemnity Clause").)   "Goods" include "any and all . . . documentary information furnished or required to be furnished by [Ibis] under this order."   (Id. at 2.027.) The second indemnity provision provides that:

> [Ibis] further agrees to indemnify and hold [BAE] harmless to the full extent of any loss, damage, or expense, including, but not limited to, any price reduction in [BAE's] prime contract with the U.S. Government . . . resulting from submission, by [Ibis] . . . of cost or pricing data that were not complete, accurate, and current as certified.

(Id. at 2.031) (hereinafter, the "Specific Indemnity Clause").)

Despite BAE's demands for indemnification, Ibis refused to reimburse BAE any of the amounts recouped by the government.[5]   (Massuch Aff. at ¶ 22.)   Instead, Ibis elected to appeal the Final Decision—with BAE sponsoring the appeal pursuant to the Sponsorship Agreement—to the Armed Services Board of Contract Appeals ("ASBCA"). (See Ibis' Ex. List, Ex. C ("ASBCA Appeal Acknowledgment Letter").)   That appeal is pending, but a resolution may be years away.   (Second Decl. of Jeff H. Eckland at ¶¶ 3–5 [Doc. No. 74-11] (describing how ASBCA appeals often take more than two years from the date they are heard to be resolved).)

## B. Procedural History

Based on the facts above, BAE brought suit against Ibis asserting claims for breach of contract and declaratory judgment.   (Second Am. Compl., Counts I and II.) BAE now asks that the Court grant it summary judgment on its declaratory judgment claim and declare that:

1. The Subcontract is a valid, clear, and unambiguous contract between BAE and Ibis;

2. Under the Subcontract, BAE is entitled to indemnification against liability, loss, and damages paid or incurred in connection with the Subcontract;

3. The Contracting Officer's Final Decision "fixed and ascertained BAE's liability resulting from [Ibis'] submission of allegedly defecting [sic] cost or pricing data," and BAE is therefore entitled to immediate indemnification from Ibis for the liability imposed by the Final Decision;

---

[5] Ibis offered to pay BAE $25,000 per month to avoid this lawsuit.   (See Second Am. Compl. at ¶ 31; Ibis Tek's Opp. to BAE Systems' Mem. of Law in Supp. of Mot. at 5 [Doc. No. 75].)   BAE refused this offer because it believes that Ibis is required to indemnify it for the entire recouped amount within a reasonable time and Ibis' repayment plan would take over ten years to make BAE whole.   (See Second Am. Compl. at ¶ 31.)

4.  BAE suffered loss or damage when the government recouped $2,740,910.27 as a result of Ibis' defective pricing and is entitled to immediate reimbursement from Ibis for the recouped amount;

5.  BAE is entitled to indemnification from Ibis for the costs, expenses, and legal fees associated with the ASBCA appeal and any subsequent appeals; and

6.  BAE is entitled to indemnification from Ibis for its attorneys' fees and expenses in pursuing its right to indemnification (i.e., this case).

(See BAE's Mot.)  In support, BAE argues that it is due immediate indemnification under both the Broad and Specific Indemnity Clauses, regardless of the ASBCA appeal.  (See generally BAE Systems' Mem. of Law in Supp. ("BAE's Mem. in Supp.") [Doc. No. 70]; BAE Systems' Reply Mem. in Supp. ("BAE's Reply") [Doc. No. 76].)

Ibis opposes BAE's Motion and argues that the Final Decision is not really final, did not trigger Ibis' indemnification obligations, and that the recoupment is not really a loss or damages because if Ibis succeeds with its appeal, the government will return the recouped amount to BAE.  (See generally Ibis Tek's Opp. to BAE Systems' Mem. of Law ("Ibis' Mem. in Opp.") [Doc. No. 75].)  At the hearing on BAE's Motion, the parties requested and received permission to file supplemental briefing on the issue of whether the Final Decision triggered Ibis' indemnity obligations under the Subcontract.  (See Ibis Tek's Suppl. Mem. in Opp. ("Ibis' Suppl. Mem.") [Doc. No. 79]; BAE Systems' Suppl. Resp. Brief ("BAE's Suppl. Mem.") [Doc. No. 82].)

## II.    DISCUSSION

### A. Standard of Review and Controlling Law

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" <u>Celotex Corp.</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  <u>Id.</u> at 323.  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 256.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Id.</u> at 248.  "Summary judgment is especially appropriate in resolving disputes involving the interpretation of unambiguous contracts."  <u>Swiss Reinsurance Am. Corp. v. SuperValu, Inc.</u>, 743 F. Supp. 2d 1050, 1054 (D. Minn. 2010) (quotations omitted).

The Subcontract states that it is governed by federal contracting law, unless such law does not cover the issue in dispute, in which case the laws of Minnesota control. (Subcontract at 2.025.)   BAE asserts that no federal contract law applies to the indemnification clauses of the Subcontract and thus Minnesota state law governs. (BAE's Mem. in Supp. at 16.)  Ibis does not dispute this assertion and cites Minnesota

case law throughout its briefing.  (See generally Ibis' Mem. in Opp.)  Thus, the Court resolves the indemnity dispute according to Minnesota law.

### B. Government Contracting Regulations

Although the parties' dispute centers on indemnification, resolving that dispute requires an understanding of government contracting and recoupment.  In general, the Federal Acquisition Regulation ("FAR") sets the policies and procedures for the government's acquisition of goods and services, like the emergency window kits procured from BAE.  See 48 C.F.R. § 1.101.  Government contracting officers may only purchase supplies and services "from responsible sources at fair and reasonable prices." 48 C.F.R. § 15.402(a).  To meet this requirement, contracting officers must obtain certified cost or pricing data from those with whom the government intends to enter into contracts.  48 C.F.R. §§ 15.402(a)(1); 15.403-4.  Under the Truth in Negotiations Act, potential prime contractors and their subcontractors are required to provide government contracting officers with certified cost or pricing information.  10 U.S.C. § 2306a(a)(A), (C).

The government may audit cost or pricing data even after a contract is completed. See 48 C.F.R. § 52.215-2.  If the audit reveals the cost or pricing data was inaccurate, incomplete, or not current, it is considered defective.  48 C.F.R. § 15.407-1(a).  If the contracting officer determines that the defective data increased the cost of the contract, the government is entitled to a price adjustment, including to the profits or fees of the prime contractor, representing the difference between the inflated price paid and the actual accurate cost.  10 U.S.C. § 2306a(e); 48 C.F.R. §§ 15.407-1(b)(1), 52.215-1(a).

Where the contract at issue is completed, the prime contractor owes the government a debt which the government may collect (i.e., recoup), after providing certain notices and demands, by withholding payment under other contracts.   See 48 C.F.R. §§ 32.601, 32.603, 32.604(b), 32.605, 32.606.

A prime contractor, or a subcontractor with the sponsorship of the prime contractor, may challenge the government's demand for a price adjustment by submitting a claim to the contracting officer.   See 41 U.S.C. §§ 7101 *et seq.*; 48 C.F.R. §§ 33.210, 52.233-1.   The contracting officer must review the facts and claims, seek assistance from legal counsel or other advisors if necessary, and prepare a detailed written report setting forth his/her decision (a.k.a. a final decision).   48 C.F.R. § 33.211.   Throughout this process, the contracting officer must "ensure that contractors receive impartial, fair, and equitable treatment."   48 C.F.R. § 1.602-2(b); see Penner Installation Corp. v. United States, 89 F. Supp. 545, 547 (Ct. Cl. 1950) aff'd by an equally divided court, 340 U.S. 898 (1950) ("[T]he contracting officer must act impartially in settling disputes. He must not act as a representative of one of the contracting parties, but as an impartial, unbiased judge.").

"The contracting officer's decision on a claim is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency, unless an appeal or action is timely commenced . . . ."   41 U.S.C. § 7103(g).   With some exceptions, a contracting officer's final decision may be appealed to the Court of Federal Claims or the ASBCA.   48 C.F.R § 33.211(a)(v).   However, important to the present matter, the appeal of a contracting officer's final decision does *not* suspend or delay the

government's right to recoup from the prime contractor.[6]  48 C.F.R. § 32.607-2(a)(2).  If the appeal of the contracting officer's final decision is successful, the government must repay any recouped amounts, plus interest.  See 48 C.F.R. § 33.208.

Although Ibis disputes that its cost and pricing data was in fact defective[7], as evidenced by its appeal to the ASBCA, it does not dispute that the Contracting Officer's Final Decision found otherwise or that the government subsequently recouped over $2.7 million from BAE.  Instead, Ibis argues that these facts did not trigger its obligation to indemnify BAE.

### C. Ibis' Indemnity Obligations

The Court must first resolve whether the Broad Indemnity Clause defines the scope of Ibis' indemnity obligations.  This resolution is important for two reasons.  First, BAE claims an immediate right to indemnification from Ibis for liability related to the defective cost and pricing data.  The Broad Indemnity Clause imposes an obligation to indemnify against both liability and loss or damage while the Specific Indemnity Clause

---

[6] Deferral of a recoupment may be granted, but usually only to small business concerns and financially weak contractors.  See 48 C.F.R. § 32.607-2(d)–(e).  BAE is neither a small business concern, nor a financially weak contractor.  (BAE's Reply at 16.)

[7] The parties agree that the Court need not determine whether Ibis' cost and pricing data was in fact defective in order to resolve BAE's indemnification claims.  (Stip. at ¶ 3 [Doc. No. 61].)  The Court makes no ruling on whether Ibis' cost and pricing data was defective.  The references in this Order to Ibis' cost and pricing data as defective merely reflect the undisputed reality that currently, according to the Contracting Officer's Final Decision, that data is considered defective.

imposes only a duty to indemnify against loss or damage.[8]   Second, BAE asks for an award of the attorneys' fees it incurred pursuing this action for indemnification against Ibis.  The Broad Indemnity Clause allows for the recovery of such fees while the Specific Indemnity Clause is silent on the subject.

### 1.   The Applicability of the Broad Indemnity Clause

BAE argues that both the Broad and Specific Indemnity Clauses govern Ibis' indemnity obligations.  (See BAE's Mem. in Supp. at 16–21.)  According to BAE, the Broad Indemnity Clause is legally enforceable and requires that Ibis indemnify BAE against liability arising from Ibis' defective cost and pricing data.  (See id. at 17–19.) Ibis contends that the Broad Indemnity Clause, by its plain language and considering the existence of the Specific Indemnity Clause, does not apply to liability arising from defective cost and pricing data.  (See Ibis' Mem. in Opp. at 7–12.)  BAE responds that the Broad Indemnity Clause is not as narrow as Ibis claims and should be read in conjunction with the Specific Indemnity Clause to cover liability related to defective cost and pricing data.  (See BAE Reply at 8–12.)

In general, "[i]ndemnity . . . arises out of a contractual relationship, either express or implied by law, which 'requires one party to reimburse the other entirely.'"  Blomgren v. Marshall Mgmt. Servs., Inc., 483 N.W.2d 504, 506 (Minn. Ct. App. 1992) (quoting Hendrickson v. Minnesota Power & Light Co., 104 N.W.2d 843, 847 (Minn. 1960)).

---

[8]  It is undisputed that under the Specific Indemnity Clause Ibis owes indemnity obligations to BAE for loss or damage resulting from the defective pricing and cost data. (See Ibis' Mem. in Opp. at 12–13 (acknowledging the existence of such obligations); BAE's Mem. in Supp. at 20.)  However, as discussed in depth below, the parties dispute whether those obligations have accrued.  See infra Part II.D.

"Contracts of indemnity may provide for indemnity against loss or damage or for indemnity against liability.  They are of two classes.  Both are intended to save the indemnitee from loss." Aetna Cas. & Sur. Co. v. Bros., 33 N.W.2d 46, 48 (Minn. 1948). To determine whether the Broad Indemnity Clause imposes obligations on Ibis related to defective cost and pricing data, the Court looks to the intent of the parties as evidenced in the Subcontract.  See Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 832 (Minn. 2012) (holding that the intent of the parties can be found in their contract).

"Where there is a written instrument, the intent of the parties is determined from the plain language of the instrument itself." Travertine Corp. v. Lexington-Silverwood, 683 N.W.2d 267, 271 (Minn. 2004).  If a contractual provision is clear and unambiguous, courts are not to rewrite, modify, or limit that provision through strained construction. Savela v. City of Duluth, 806 N.W.2d 793, 797 (Minn. 2011).  However, "the terms of a contract must be read in the context of the entire contract," Quade v. Secura Ins., 814 N.W.2d 703, 705 (Minn. 2012) (quotations omitted), and "so as to give effect to all of its provisions," Metro. Airports Comm'n v. Noble, 763 N.W.2d 639, 645 (Minn. 2009).

In the Broad Indemnity Clause, Ibis agreed to:

> assume entire responsibility and liability for injuries (including death) to any person, whether an employee of [Ibis] or otherwise, for loss of or damage to any property regardless of ownership, and for any other loss or legal damages arising out of, resulting from, or in any manner connected with the . . . goods supplied by [Ibis] . . . in connection with this order.

(Subcontract at 2.024.)  Although the phrase "and for any other loss or legal damages arising out of, resulting from, or in any manner connected with," is broad, it must be read in the context of the rest of the Broad Indemnity Clause and the Subcontract generally.

The Broad Indemnity Clause evidences the parties' intent that Ibis shield BAE from any liability related to injuries incurred while creating the emergency windows, or later caused by the windows.  Tort claims involving personal injury, including death and negligence, are referenced throughout this clause.  (See id.)  The fact that the Broad Indemnity Clause also requires Ibis, upon BAE's request, to provide certificates of workers' compensation and comprehensive general liability insurance supports this more limited understanding of the Broad Indemnity Clause.  (See id.)   However, the best evidence the parties did not intend for the Broad Indemnity Clause to apply to defective pricing and cost data is the existence of the Specific Indemnity Clause.

The Specific Indemnity Clause, by its very title ("Price Reduction for Defective Cost or Pricing Data"), shows that the parties intended that it define Ibis' indemnity obligations related to defective cost or pricing data.  (See id. at 2.031.)  That clause even describes precisely what happened here—a price reduction in BAE's Prime Contract and a recoupment by the government resulting from Ibis' defective cost and pricing data. (See id.)  In this event, Ibis is obligated to "indemnify and hold [BAE] harmless to the full extent of any loss, damage, or expense . . . ."  (Id.)  BAE and Ibis, sophisticated entities well-versed in the world of government contracting, plainly understood the risks associated with defective pricing and cost data and specifically agreed what the indemnity obligations would be under such circumstances.

It would be a "strained construction," amounting to rewriting or modifying the Subcontract, to find that the Broad Indemnity Clause defined Ibis' indemnity obligations related to defective pricing and cost data.  See Savela, 806 N.W.2d at 797.  The Broad

Indemnity Clause imposes indemnity obligations for both liability and loss or damage arising from the manufacturing or use of the emergency windows.    The Specific Indemnity Clause imposes indemnity obligations for the loss or damage created by Ibis' submission of defective cost and pricing data.   The two clauses are plainly different and only the Specific Indemnity Clause is applicable here.   If the Broad Indemnity Clause applied as BAE claims, it would make the Specific Indemnity Clause redundant and ineffective, a result not permitted in contract interpretation.[9]   See Metro. Airports Comm'n, 763 N.W.2d at 645.

To be clear, the Specific Indemnity Clause governs Ibis' indemnity obligations in this matter, requiring that Ibis "indemnify and hold [BAE] harmless to the full extent of any loss, damage, or expense" resulting from Ibis' defective cost and pricing data.   This does not include indemnification against liability for the same.   See Bros., 33 N.W.2d at 48 (describing indemnification against liability and that against loss or damages as "of two classes," although "[b]oth are intended to save the indemnitee from loss").

---

[9] BAE argues that the Subcontract allows for the Broad and Specific Indemnity Clauses to be read cumulatively "to ensure a complete indemnification with no gaps."   (BAE's Reply at 10–11.)   The Subcontract does contain a cumulative remedies clause which reads, "[t]he remedies provided in this terms and conditions document shall be cumulative to all other rights or remedies now or hereafter given to [BAE] *by law or in equity* . . . ."   (Subcontract at 2.025 (emphasis added).)   Under this clause, BAE may pursue any of its contractual or legal rights and remedies "successively or concurrently." (Id.)   Nothing in the cumulative remedies clause allows BAE to read the Broad and Specific Indemnity Clauses together to define Ibis' indemnity obligations related to defective pricing and cost data.

## 2.  Costs, Expenses, and Attorneys' Fees

BAE contends it is entitled to recover its "costs, expenses, and legal fees and disbursements in connection with the ASBCA appeal, any subsequent appeals, and this action," for two reasons.  (BAE's Mem. in Supp. at 25–26.)  First, it points to the Broad Indemnity Clause which states that BAE is entitled to indemnification for "all costs, expenses and legal fees and disbursements paid or incurred in connection with [claims indemnified under that clause] and all legal fees and disbursements paid or incurred to enforce the provisions of this [clause]."  (See id. (quoting Subcontract at 2.024).) Second, BAE claims that under Minnesota law, an indemnitee "may recover its fees and expenses when an action is found to be within the hold harmless clause of the contract." (Id. at 26 (citing Koehnle v. M.W. Ettinger, Inc., 353 N.W.2d 612, 616 (Minn. Ct. App. 1984).)

In response, Ibis argues that the Broad Indemnity Clause does not apply and the Specific Indemnity Clause does not allow for attorneys' fees incurred while pursuing a right to indemnification.  (Ibis' Mem. in Opp. at 17.)  Ibis further contends that it is paying the costs associated with the ASBCA appeal and thus abiding by the terms of the Subcontract and Sponsorship Agreement.  (See id. at 18.)  It is unclear from the briefing whether BAE has incurred attorneys' fees or other costs defending against the government's defective pricing determination, or associated with sponsoring Ibis' challenges to that determination.

"The general rule in Minnesota is that attorney fees are not recoverable in litigation unless there is a specific contract permitting or a statute authorizing such

recovery." <u>Dunn v. Nat'l Beverage Corp.</u>, 745 N.W.2d 549, 554 (Minn. 2008) (quotations and citations omitted).  BAE does not allege that any statute authorizes its claim for attorneys' fees and expenses, relying instead on the Subcontract.  Where a party is contractually indemnified against certain claims, it is entitled to its reasonable attorneys' fees in defending against covered claims.  See <u>Koehnle</u>, 353 N.W.2d at 616. "However, . . . even where an indemnitee is entitled to attorney fees incurred in defending an indemnified claim, he is *not* entitled to fees and costs for prosecuting his right to indemnification unless there is an agreement with the indemnitor that expressly so provides."  <u>Sheely v. Mower Cty. Farmers Mut. Ins. Co.</u>, No. C0-96-434, 1996 WL 509759, at *3 (Minn. Ct. App. Sept. 4, 1996) (emphasis added).

As described above, the Broad Indemnity Clause does not define Ibis' indemnity obligations related to defective pricing and cost data.  Thus, it does not control what costs, expenses and fees BAE may recover here.  Importantly, the Broad Indemnity Clause's language allowing for BAE to recover "all legal fees and disbursements paid or incurred to enforce the provisions of this [clause]," does not entitle BAE to its attorneys' fees incurred pursuing its indemnification claim against Ibis in this case.

The Specific Indemnity Clause indemnifies BAE against any "loss, damage, or expense . . . resulting from submission, by [Ibis] . . . of cost or pricing data that were not complete, accurate, and current as certified."  (Subcontract at 2.031.)  Although the parties clearly understood how to create a right to attorneys' fees in the Broad Indemnity Clause, they chose not to articulate that right in the Specific Indemnity Clause, which makes no mention of attorneys' fees or any other cost related to pursuing a claim for

17

indemnification.  The case of <u>Seifert v. Regents of Univ. of Minnesota</u>, 505 N.W.2d 83 (Minn. Ct. App. 1993) offers persuasive guidance on this point.  There, a construction worker ("Seifert") brought suit against his employer-contractor ("NewMech") and the project owner ("Regents") for injuries he sustained on the job site.  <u>Id.</u> at 84.   Regents tendered the defense of Seifert's claim to NewMech, pursuant to the terms of the indemnity agreement between them, but NewMech did not accept.  <u>Id.</u>  Regents later tendered the defense to one of NewMech's insurers ("SPC"), which accepted and ultimately settled Seifert's claim against Regents.  <u>Id.</u>  SPC paid the attorneys' fees Regents incurred between the date Regents tendered the defense to SPC and the settlement.  <u>Id.</u>  However, SPC "refused to reimburse [Regents] for defense costs before the date of tender."  <u>Id.</u> at 85.

On summary judgment, the district court awarded Regents the attorneys' fees it incurred defending against Seifert's claim before that defense was tendered to SPC and those fees incurred pursuing indemnification from NewMech.  <u>Id.</u>  NewMech appealed, arguing in part that Regents was not entitled to the attorneys' fees and costs it incurred pursuing indemnification.  <u>Id.</u> at 86.  The Minnesota Court of Appeals summarized the indemnification clause of the contract between NewMech and Regents as follows, "NewMech indemnified [Regents] 'to the fullest extent permitted by law' against all 'claims, damages, losses and expenses including attorney fees' arising from the contractor, the subcontractors, or their employees."  <u>Id.</u> (quoting the NewMech-Regents contract).

The appellate court concluded that Regents was not entitled to the attorneys' fees incurred seeking indemnification from NewMech.  Id.

> NewMech only indemnified [Regents] for attorney fees "arising out of or resulting from the performance, or lack of performance of the work."  This language refers to [] Regents' legal expenses incurred in defending Seifert's negligence claim; it does not on its face entitle [Regents] to attorney fees and costs incurred in prosecuting its right to indemnification from NewMech.

Id. at 87 (quoting the NewMech-Regents contract).

Here, the Specific Indemnity Clause makes no mention of attorneys' fees whatsoever.  Even without such language, BAE is entitled to any attorneys' fees it incurs defending against claims arising from Ibis' defective pricing and cost data (i.e., sponsoring Ibis' challenge(s) to the government's defective pricing determination).[10]  See Koehnle, 353 N.W.2d at 616 (holding that an indemnification clause promising to hold the indemnitee "harmless from any and all costs, expenses, or losses caused by [the indemnitor]" required the indemnitor to pay the indemnitee's attorneys' fees incurred defending against an indemnified claim).  However, attorneys' fees incurred in pursuit of indemnification are another matter because they do not arise from the defective pricing and cost data (i.e., they were not incurred defending against an indemnified claim).  As explained in Seifert:

---

[10] The Court notes that Ibis separately agreed "to pay [BAE] for any costs or expenses (other than the costs of employee time during ordinary business hours) required to sponsor and support [Ibis' claim to the Contracting Officer and its appeal of the Final Decision to the ASBCA] or otherwise respond to [Ibis'] requests."  (Sponsorship Agreement at 3.008.)  This is an independent basis on which to hold that Ibis must reimburse BAE for any costs or expenses BAE incurred, or incurs in the future, by sponsoring Ibis' challenges to the defective pricing and cost data determination.

> Indemnity obligations . . . require the indemnitor to hold the indemnitee harmless from costs in connection with a particular class of claims. Legal fees and expenses incurred in defending an indemnified claim are one such cost and thus fall squarely within the obligation to indemnify. Consequently, attorney's fees incurred in defending against liability claims are included as part of the indemnity obligation implied by law and reimbursement of such fees is presumed to have been the intent of the draftsmen unless the agreement explicitly states otherwise. … Such reasoning does not apply to fees and expenses incurred in establishing the existence of an obligation to indemnify, since such expenses are not by their nature a part of the claims indemnified against. Rather, they are costs incurred in suing for a breach of contract, to-wit, the failure to indemnify.

505 N.W.2d at 86 (quoting Peter Fabrics, Inc. v. S.S. Hermes, 765 F.2d 306, 316 (2d Cir. 1985)). Since the Specific Indemnity Clause does not explicitly cover attorneys' fees incurred pursuing indemnification, BAE is not entitled to them.[11] See id. at 86–87.

Pursuant to the plain language of the Specific Indemnity Clause, BAE is entitled to indemnity from Ibis for any expense, cost, or fee resulting from Ibis' defective pricing and cost data. This includes any fee or expense BAE incurred, or incurs in the future, defending against the government's defective pricing determination or sponsoring Ibis' challenge to that determination (including the pending ASBCA appeal).[12] However, BAE is not entitled to recover its attorneys' fees incurred pursuing its indemnification claims against Ibis.

---

[11] BAE points to no other provision of the Subcontract whereby it is entitled to the attorneys' fees it incurs in pursuing a breach of contract claim related to the Subcontract.

[12] Ibis avers that it has already assumed the costs and responsibility for its ASBCA appeal. (See Ibis' Mem. in Opp. at 18.) This fact does not change the Court's conclusion, or Ibis' obligations under the Subcontract and Sponsorship Agreement. To the extent BAE incurred fees or expenses covered by these contracts before Ibis assumed responsibility—or incurs them in the future despite Ibis' assumption of responsibility—BAE has a right to indemnification.

### D.  Accrual of BAE's Indemnification Claim

BAE contends that its right to indemnification for loss or damage under the Subcontract accrued, at the latest, when the government recouped over $2.7 million from it because of Ibis' defective cost and pricing data.  (BAE's Mem. in Supp. at 21–23.)  Ibis argues that any claim BAE has to indemnification has not accrued for two reasons.  (See Ibis' Mem. in Opp. at 13–17.)  First, Ibis asserts that BAE has not established that any loss or damage it suffered "resulted from" Ibis' defective pricing and cost data.  (Id. at 13–16.)  Specifically, Ibis contends that the Contracting Officer's Final Decision "serves as nothing more than an allegation or claim by the government," one which is not truly final, as evidenced by Ibis' appeal.  (Id. at 14–15.)  Second, Ibis contends that the government's recoupment from BAE was not a loss because if Ibis' appeal is successful, the government will repay the recouped amount, plus interest.  (Id. at 16–17.)

BAE claims that Ibis' pending ASBCA appeal does not excuse its indemnification obligations under the Subcontract.  (BAE's Reply at 13–16.)  Furthermore, BAE argues that the potential for government repayment of recouped funds if Ibis' appeal is successful does not change the current reality that BAE suffered a loss entitling it to immediate reimbursement from Ibis.[13]  (Id. at 16.)

An indemnitee's right to indemnification for loss accrues when it is compelled to pay a covered loss and so pays.  Bros., 33 N.W.2d at 48; see E.S.P., Inc. v. Midway Nat. Bank of St. Paul, 447 N.W.2d 882, 885 (Minn. 1989) ("The contingency giving rise to

---

[13]  BAE acknowledges that if Ibis reimburses BAE the amount recouped by the government, but is ultimately successful with its appeal, BAE will be required to return the reimbursed funds to Ibis.  (BAE's Mem. in Supp. at 4.)

the indemnity claim does not occur until loss is experienced by the indemnitee."); see also Campbell v. Rotering, 43 N.W. 795, 796 (Minn. 1889) ("According to all the authorities, an undertaking to 'indemnify and save harmless' gives no right of action until the party indemnified is actually damaged, i.e., has been compelled to pay and has paid, by reason of the thing against which or consequences of which he is indemnified.").  Put another way, the common law holds that "the right of indemnity does not accrue until the liability of the party seeking indemnity has become finally fixed and ascertained, or until after the claimant has settled or has paid the judgment or more than a commensurate share of it."  Metro. Prop. & Cas. Ins. Co. v. Metro. Transit Comm'n, 538 N.W.2d 692, 695 (Minn. 1995) (quotations omitted).

In March of 2014, the Contracting Officer's Final Decision "fixed and ascertained" BAE's liability, declaring that Ibis' cost and pricing data was defective.  The Final Decision was more than an allegation or claim; under the federal statutes and regulations described above, it was an adjudication of BAE's liability (related to Ibis' cost and pricing data) that entitled the government to recoup over $2.7 million from BAE.  Ibis' pending ASBCA appeal does not alter this reality, especially since that appeal did not toll the government's recoupment from BAE.  See 48 C.F.R. § 32.607-2(a)(2).  BAE's claim to indemnification accrued when the government in fact recouped over $2.7 million from it because of Ibis' defective pricing and cost data.  See Bros., 33 N.W.2d at 48; E.S.P., 447 N.W.2d at 885.

In essence, Ibis argues that its indemnity obligations are not triggered until its appeals are exhausted.  But this is not what the Specific Indemnification Clause says, nor

is it a conclusion supported by the case law.  BAE's claim to indemnification for "any loss, damage, or expense . . . resulting from submission, by [Ibis] . . . of cost or pricing data that were not complete, accurate, and current as certified" has accrued and Ibis must honor its indemnity obligations.

## III.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.  Plaintiff BAE Systems Land & Armaments, L.P.'s ("BAE") Motion for Summary Judgment for Declaratory Relief ("BAE's Motion") [Doc. No. 69] is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  BAE and Defendant Ibis Tek ("Ibis") entered into a valid and enforceable contract which, in relevant part, requires Ibis to indemnify and hold harmless BAE to the full extent of any loss, damage, or expense resulting from Ibis' submission of cost or pricing data that were not complete, accurate, and current as certified;

    b.  BAE suffered a loss or damage entitling it to indemnification from Ibis when the government recouped $2,740,910.27 as a result of Ibis' defective pricing and cost data;

    c.  BAE is therefore entitled to immediate indemnification from Ibis for the recouped amount;

    d.  BAE is also entitled to immediate indemnification by Ibis for any expense—including attorneys' fees—it incurred, or incurs in the future, defending against the government's defective pricing determination, or sponsoring Ibis' challenges to that determination;

    e.  BAE's Motion for Summary Judgment is in all other respects **denied**.

2.  The Court notes that BAE did not move for summary judgment on its breach of contract claim.  (See BAE's Motion.)  However, resolution of BAE's declaratory judgment claim appears to resolve the entire dispute between the parties.  Within fourteen days of this Order, BAE or Ibis may file briefing addressing whether

issues remain for the Court to resolve.  If neither party files any briefing on the subject, the Court will issue an order dismissing BAE's breach of contract claim without prejudice.


Dated:  June 14, 2016                        s/ Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge